ALBERTA NEWMAN v. VANDER BIE'S, INC. AND ANOTHER.[1]

No. 30,329.

May 31, 1935.

*Joseph F. Cowern* and *George W. Peterson,* for relator.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for respondents.

I. M. OLSEN, JUSTICE.

The case comes here on *certiorari* to review the findings of the referee and the order of the industrial commission affirming the findings and decision of the referee denying further compensation and expenses to petitioner, John A. Newman, hereinafter referred to as the petitioner.

Petitioner was employed by Vander Bie's, Incorporated, as a truck driver, distributing the products of said company on routes out from this city. On September 9, 1931, he was severely injured when a truck he was operating left the road in the vicinity of

[1]Reported in 261 N. W. 703.

Marshall, Minnesota. He suffered a fracture of the base of the skull and other less severe injuries, resulting in the loss of hearing in one ear, which was permanent. There was some impairment of the sight of one eye, which, after treatment, was restored. He was taken to the hospital at Marshall and remained there until September 29, 1931. He was then taken to St. Luke's Hospital in St. Paul, where he remained until October 12, 1931. On that day he returned to his home in St. Paul, where he continued to receive care and treatment for some time. He returned to work for the company on February 2, 1932. From then until March 22 of that year he worked in the cabinet department. On March 22 he started driving a truck in the city of St. Paul. On April 1 he resumed driving a truck on two out-of-town routes, doing the same kind of work he had done for several years prior to the accident. He continued this work until on or about November 6, 1932, when he was discharged by the company. He was paid wages or compensation up to February 24, 1933, covering the entire period that he did not work as well as the time he did work, and was paid full compensation for the loss of hearing in his ear. All medical and hospital expenses and expenses at the sanitarium were paid by the company. On May 15, 1933, the company agreed to reëmploy him, but when he reported for work the next day it appeared that he was mentally deranged and unfit to go to work. He was then taken to Mounds Park Sanitarium for mental care and treatment and was there examined a number of times by the three medical experts who testified at the trial. About the middle of August, 1933, he returned to his home, where he has since been cared for. It is admitted that in May, 1933, he suffered from some form of insanity or mental disorder, which has from then on totally disabled him from any employment. His physical injuries from the accident had completely healed, as far as appears, about the time he resumed work on February 2, 1932. In May, 1933, he petitioned the industrial commission for further compensation on the ground of permanent disability because of his mental condition or insanity, claiming that his insanity permanently and totally disables him from any gainful occupation.

The question presented to the referee was whether the mental impairment or insanity which disabled the petitioner, and which it is not seriously contended may not be permanent, was connected with and a result of the accidental injuries suffered on September 9, 1931. The referee found that the mental condition from which the petitioner was suffering at the time of the hearing, and is now suffering, was not a result of the accidental injuries received on the date stated. On appeal to the industrial commission, the commission, by unanimous order and decision, in all things affirmed the findings and decision of the referee.

The question here presented for review is whether there is evidence sufficient to sustain the referee's finding that the mental condition and disability of the petitioner were not a result of the accidental injuries received by him. The referee and industrial commission are the triers of the facts in these compensation cases. In reviewing the orders of the industrial commission, we follow the rule that if there is any evidence reasonably tending to sustain its findings and conclusion this court cannot interfere. We are not triers of the facts here.

On the question presented, the expert medical witnesses agreed that, unless within one year from the time of the accident, the petitioner showed evidence of mental changes, symptoms of mental derangement or insanity, and changes of character and personality, then the insanity could not be attributed to the accident.

The review narrows down to the question of whether within one year from the time of the accident the petitioner showed symptoms of insanity in the way of mental disorder, delusions, and changes of personality. This question was fully tried before the referee, and a large number of witnesses testified on each side. The evidence was such that the referee could have found in favor of the petitioner on that issue. Starting with that premise, it is not necessary to set forth any detailed statement of the evidence favorable to the petitioner. It is sufficient to say that such evidence tended to show that petitioner was mentally unsound and in fact insane for some months before the expiration of the year, and we confine the review of the evidence to a brief outline of the opposing evidence

in favor of the respondents, the employer and insurer. There were a large number of witnesses. Doctors Robertson and Gray, who treated the petitioner while he was in the hospital at Marshall, testified in substance that, after the first week or ten days petitioner was mentally clear and showed no signs of mental disorder. Dr. Robertson also saw him in the spring of 1932. He had known petitioner before the accident and noticed no change thereafter in his personality or his mental condition. Dr. Gray testified that he watched for symptoms of brain injury while petitioner was in the hospital and found none; that petitioner was clear mentally when he left the hospital. Dr. Bell was petitioner's attending physician while he was in St. Luke's Hospital and treated him there every day from September 29 to October 12, 1931. Dr. Bell also had seen and examined petitioner at the hospital at Marshall. After October 12 petitioner went to Dr. Bell's office for treatment on different dates up to December 18, 1931, and also in January and February, 1932. The doctor saw no evidence of any mental disorder; there was no confusion or lack of coördination in petitioner's talk. Dr. Leavenworth treated petitioner for his ear in November and December, 1931, and again saw him in August, 1932. He saw no evidence of any mental disease or abnormal condition at any time. Dr. F. E. Burch treated petitioner's eyes in October, November, and December, 1931, and in January, March, and April, 1932. He never noticed anything wrong with petitioner mentally. His responses, coöperation, and tests were perfect. The doctor never suspected any mental trouble. The medical experts who testified were Doctors Engberg and Hultkrans for the petitioner, and Dr. Hengstler for the respondents. None of them had seen petitioner before the time he was taken to Mounds Park Sanitarium in May, 1933, and they based their opinions on examinations of petitioner while at the sanitarium and on the testimony of witnesses at the trial. The experts for both sides agreed that petitioner was insane at the time they examined him and that, if symptoms of such insanity showed within one year after the accident, it could then be attributed to the injuries received. The experts for petitioner gave their opinion that the insanity resulted from the accident. The expert for respondents was of the contrary view.

The evidence of other witnesses, favorable to respondents, may briefly be summarized as follows: The secretary and 12 other employes of the Vander Bie company, among them two truck drivers and two garage employes, were called as witnesses for the respondents. These employes had occasion to see the petitioner at numerous times when he was employed between February 2, 1932, and up to the time he was discharged on October 24, 1932, and in substance their testimony was that the petitioner was normal and that they saw no evidence of mental disorder or insanity. Then there were 11 customers of the company who were served by the petitioner during the time he worked as truck driver on the routes from March 22 until October 24, 1932, and who testified in substance that they dealt with and saw petitioner practically every other day during that time and had business dealings with him; that he appeared to be mentally competent and showed no signs of mental disorder or insanity. In driving his truck on these routes the petitioner had to make entries of all sales, deliveries, and moneys collected and make a proper return to the office of the company on his return from each trip. The evidence is undisputed that he kept track of all merchandise taken out by him and made proper returns of all sales and orders as well as any of the truck drivers during the time from March 22 until October 24, 1932. The evidence for respondents tended to show that for more than one year after the accident petitioner was sane and showed no signs of mental disorder.

It seems quite clear that there was such conflict in the evidence that the referee and the commission could have found either way on the question as to whether the petitioner's insanity was caused in whole or in part from the injuries suffered in the accident on September 9, 1931. That made it a question of fact for the triers, and, there being evidence to sustain their finding thereon, we cannot interfere.

Counsel for petitioner ably argue that witnesses for their client testified to many instances, within a year after the accident, when petitioner showed signs of mental change, hallucinations, and indications of mental unsoundness and that such testimony was not

directly contradicted. But it is equally true that many witnesses for respondents testified to numerous instances, within the same period, when they saw, conversed with, and transacted business with petitioner and found him mentally normal and sane, and such testimony is not directly contradicted. The whole trend of the testimony favorable to respondents is to contradict and oppose the testimony for petitioner. In that situation, the triers of the facts were not bound to accept and follow the testimony of the witnesses for one side or the other. It was their duty to consider and weigh all the testimony and to find the facts as required by the preponderance of the evidence as it appeared to them. Having heard and seen the witnesses, the referee had better opportunity to weigh the testimony and determine the credibility of witnesses than we have. Having found the facts and there being evidence reasonably sufficient to sustain the findings, there must be an affirmance.

The motion to strike certain portions of the brief for relators has no material bearing on the issue we have considered and need not be now passed upon.

The writ of *certiorari* is discharged, and the findings of the referee and order of the industrial commission thereon are affirmed.

Affirmed.

UPON APPLICATION FOR REARGUMENT.

On July 5, 1935, the following opinion was filed:

PER CURIAM.

The typewritten record, allowed in this case, contains over 450 pages. It contains the testimony of over 40 witnesses, about evenly divided as between those called by one party and those called by the other. To refer to and set out in an opinion the substance of what each witness testified to was not practicable. So, except as to the testimony of the doctors, no attempt was made so to do. The witnesses on each side were treated as a class. As it was conceded at the outset that the evidence was such that the referee and commission could have found either way, the inquiry was limited to a consideration of whether there was any evidence reasonably sufficient to sustain findings for the respondents. In so doing, the

testimony of the 20 or more witnesses for respondents was considered and the general effect thereof ascertained.

There were one garage mechanic and two other men who were in and about the garage and at the loading platform checking the drivers and the loads, called by respondents. In the opinion we referred to two men as garage employes. The reference may not have been technically accurate. The mechanic, whose testimony is stressed in the motion for reargument, gave some testimony favorable to respondents and some favorable to petitioner.

It is claimed that the reference in the opinion to two truck drivers called by respondents is an error and that there was only one. The record shows there were two drivers of trucks but that one of them was not employed full time.

The statement in the opinion that "these employes had occasion to see the petitioner at numerous times" has reference to the employes as a group and is not confined to the testimony of the two garage employes or the two truck drivers. Taken as a whole, these employes did have occasion to see petitioner numerous times.

It is inadvertently stated in the opinion that the secretary and 12 other employes were called as witnesses by respondents. It should read: "The secretary and eight other employes" were so called, and the statement is corrected accordingly.

In the opinion it is stated: "All medical and hospital expenses and expenses at the sanitarium were paid." There should have been added the limitation: "up to May 15, 1933, and, by agreement between the insurer and petitioner, there was paid the further sum of $509.82 for expenses at the sanitarium after May 15, 1933."

Fault is found with the statement that petitioner "was paid wages or compensation up to February 24, 1933, covering the entire period." Wages were paid apparently from February 2 to November 6, 1932. Compensation appears to have been paid up to February 24, 1933.

Rehearing denied.